IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| RIEVON BEN LEE, #345000 | * | |
| Plaintiff | * | |
| v. | * | CIVIL ACTION NO. L-10-503 |
| J. MICHAEL STOUFFER, *Commissioner of Corrections*, et al. | * | |
| | * | |
| Defendants | | |
| | *** | |

MEMORANDUM

Pending is a Motion for Summary Judgment filed on behalf of Defendants J. Michael Stouffer, Mr. Bozman and Cpt. Tyler. ECF No. 21. Plaintiff has not responded.[1] Upon review of the papers and exhibits filed, the Court finds an oral hearing in this matter unnecessary. See Local Rule 105.6 (D. Md. 2011).

**Background**

Plaintiff's Complaint is a laundry list of allegations concerning his incarceration in the Maryland Division of Corrections (DOC). Most of his complaints revolve around allegations of improper disciplinary proceedings, retaliation and harassment by correctional staff.

Summarizing Plaintiff's Complaint chronologically, he begins by stating that on May 19, 2008, while housed at the Toulson Boot Camp in Jessup, Maryland he received a false disciplinary infraction. Plaintiff alleges that he was denied requested witnesses. He claims that

---

[1]Pursuant to the dictates of Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. 1975), on September 24, 2010, Plaintiff was notified that Defendants had filed a dispositive motion, the granting of which could result in the dismissal of his action. ECF No. 22. Plaintiff was also informed that he was entitled to file materials in opposition to that motion within 17 days from the date of that letter and that his failure to file a timely or responsive pleading or to illustrate, by affidavit or the like, a genuine dispute of material fact, could result in the dismissal of his case or in the entry of summary judgment without further notice of the Court. Id. Thereafter, Plaintiff, on three occasions, requested and was granted extensions of time to respond to the motion. ECF Nos. 24-29. As of the within signature date, Plaintiff has failed to respond.

the false infraction, coupled with the denial of witnesses, resulted in a guilty finding at the adjustment hearing which caused him to lose good conduct credits and be expelled from the boot camp. ECF No. 1.

Plaintiff was then transferred to the Brockbridge Correctional Facility where he states that he was verbally assaulted by Correctional Officer Abass who, as a result of their encounter, falsified an infraction against Plaintiff. Plaintiff was next transferred to the Maryland Correctional Institution-Jessup (MCI-J) where his infraction hearing was held on June 16, 2008. Plaintiff states he was improperly found guilty of this infraction due to Hearing Officer P. Jukenelis's friendship with BCF employees. Plaintiff states he was expelled from the entire pre-release system and lost additional good conduct credits. Id.

Plaintiff states that while he was at MCI-J, staff refused to process his request for payment for his trial transcripts which caused him to be unprepared for his July 30, 2008 post-conviction hearing.

He states that at this time he explained to unnamed individuals that he could never be sent to the Eastern Correctional Institution (ECI) because a large number of persons involved in his case were employed there. Plaintiff states that he was advised that he would be sent to the Jessup Correctional Institution (JCI). Plaintiff states that thereafter he was sent to ECI. He met with Case Manager Bozman who advised Plaintiff that he had "detailed personal knowledge" of Plaintiff's case and that people close to Bozman were involved. Plaintiff states that Bozman questioned him in an "interrogative manner, about things and details of [his] case that [were] well beyond [Bozman's] authority." Plaintiff states that he told Bozman it was a threat to his safety to remain at ECI. Bozman agreed and told Plaintiff he would be removed within a week.

Plaintiff states that his continued confinement on segregation upon his transfer to ECI was improper. He further alleges that he had "problems" with his mail. Plaintiff alleges that when he complained about the difficulty with his mail he was forced into an empty cold cell and forced to remain there sleeping on the concrete floor for over five days as retaliation for his complaint. Id.

Plaintiff next alleges that on or about December 23, 2008, he asked Nurse Meredith why he did not receive his eyeglasses. He was told by the nurse that she was tired of his complaints and to stop bothering her. Plaintiff claims that in retaliation for arguing with Nurse Meredith, "Sgt. J.B." had Plaintiff placed in a psychiatric observation cell where he was stripped naked and made to stay for a week, sleeping on a metal mattress-less bed frame. Plaintiff states he later learned that Nurse Meredith lied to correctional staff telling them Plaintiff had threatened to kill himself during the Christmas holiday.

On January 23, 2009, Plaintiff alleges Correctional Officer Deshields attempted to not give a meal to the man in the cell across from Plaintiff. Plaintiff protested and Deshields closed Plaintiff's feed slot without retrieving Plaintiff's tray. As Deshields passed Plaintiff's cell, Plaintiff showed the tray in an effort to "indicat[e] his error" and advising the correctional officer "he needed to pay more attention." Deshields declined to remove the tray and "misrepresented" the events to indicate Plaintiff refused to give the tray to him. As a result of this infraction Plaintiff was placed on "food loaf." Plaintiff states that he requested the tier videotape of these events at his first adjustment hearing on this matter, but the tier officers indicated they could not find the footage. The hearing was postponed and when reconvened Officer Culotta testified that he had reviewed the footage and described to the hearing officer what he saw. Plaintiff states that as a result of his false testimony he was found guilty and given more "lock up time." Id.

3

On March 12, 2009, Plaintiff states, Correctional Officer Smith told Plaintiff that he "had put his bodily fluids in a food tray, and had sat it aside specifically for [Plaintiff]." Plaintiff requested the next tray in line. The officer refused to give it to him. Plaintiff refused to remove his arm from the feed slot so that the slot could be closed. Plaintiff received an infraction for this conduct and after a hearing received additional segregation time. Plaintiff also states that as a result of this incident he was placed back on food loaf for a week. Id.

Plaintiff states that during this time he would be denied showers.

On November 24, 2009, Plaintiff states that Bozman appeared on the tier. Plaintiff called to him and confronted him about his repeated pronouncements that Plaintiff would be transferred out of ECI. Plaintiff shouted to Bozman accusing him of keeping him at ECI so they can keep control of Plaintiff's efforts at exoneration. Bozman, laughed and said, "That's what I do!" Id.

In January 2010, Plaintiff complained to Nurse Meredith of the severe psychological duress he was under during his time at ECI. Plaintiff states that he emphasized that things were being done intentionally to inflict mental harm upon him. Plaintiff states that the Nurse laughed at him and disregarded his complaints. Id.

Plaintiff alleges that ECI Mailroom Supervisor Cpt. Tyler has abused her position and used her authority to disrupt and cause harm to Plaintiff in his efforts at exoneration. Plaintiff states that since his arrival at ECI he has had difficulties with his mail. He states that ECI personnel refused to sell him items from the commissary. Plaintiff states that since ECI's mailroom and commissary are two different departments this establishes a conspiracy between them. He further alleges that he complained regularly and repeatedly about the refusal to send out his mail. He states this deprived him of "essential case evidence and information." He also

4

states that his mail was illegally read. He states that his friends and family began to use certified mail in an effort to increase the chance of his receiving the mail. Since he was refused stamps he began to do the same, he had to pay a premium to mail out correspondence. Specifically, Plaintiff states that when he sought a writ of certiorari from the United States Supreme Court in response to the affirmation of the United States District Court for the District of Maryland's denial of his 28 U.S.C. §2254 by the Fourth Circuit Court of the Appeals, ECI's mailroom seized and withheld the petition demanding he pay postage a second time. Plaintiff states records showed that postage had already been deducted from his account. He states the petition was held even after his mother came to ECI to retrieve it to forward it to the court. He states the petition was held two weeks and when it was released to his mother only after his deadline had expired. Plaintiff was advised by his mother that the envelope had been opened and portions of the transcript had been removed. Plaintiff states that this has caused him to spend more time falsely imprisoned because "we cannot know for sure" that the Supreme Court would not have granted his petition and ordered his release.

Thereafter, Plaintiff states, he filed a Petition for Writ of Habeas Corpus in the state courts. Plaintiff states he forwarded the petition to his mother in order that she make copies and forward the petition to the courts but she claimed not to have received the mailing. Plaintiff maintains generally that his letters were read, seized, withheld, destroyed and/or returned. He also states that legal books he ordered were not received due to an "illegal" ECI directive. Plaintiff also claims that he did not receive religious books he ordered.

Lastly, Plaintiff alleges that money vouchers he has requested to pay his debts have not been processed by the financial department. Id.

## Standard of Review

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

Anderson v. Liberty Lobby, Inc., 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to....the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." Dennis v. Columbia Colleton Med. Ctr., Inc., 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." Bouchat, 346 F.3d at 526 (internal quotation marks omitted) (quoting Drewitt v. Pratt, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986)).

## Analysis

**Respondeat Superior**

Plaintiff's Complaint against J. Michael Stouffer is based solely upon the doctrine of respondeat superior, which does not apply in § 1983 claims. See Love-Lane v. Martin, 355 F. 3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983); see also Trulock v. Freeh, 275 F.3d 391, 402 (4th Cir. 2001) (no respondeat superior liability in a *Bivens* suit). Liability of supervisory officials must be "premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" Baynard v. Malone, 268 F.3d 228, 235 (4th Cir. 2001), citing Slakan v. Porter, 737 F.2d 368, 372 (4th Cir. 1984). Supervisory liability under § 1983 must be supported with evidence that (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff, (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices, and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. See Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994). Plaintiff has pointed to no action or inaction on the part of J. Michael Stouffer that resulted in a constitutional injury, and accordingly, his claims against Stouffer shall be dismissed.

**Classification and Transfers**

"[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of

his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution." Meachum v. Fano, 427 U.S. 215, 224 (1976). In the prison context there are two different types of constitutionally protected liberty interests which may be created by government action. The first is created when there is a state created entitlement to an early release from incarceration. See Board of Pardons v. Allen, 482 U. S. 369, 381 (1987) (state created liberty interest in parole); Wolff v. McDonnell, 418 U. S. 539, 557 (1974) (state created liberty interest in good conduct credits). The second type of liberty interest is created by the imposition of an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U. S. 472, 484 (1995). Following the reasoning of the Supreme Court in Sandin, it is not atypical for inmates to be transferred among correctional facilities. See Olim v. Wakinekona, 461 U.S. 238, 244-45 (1983); Hewitt v. Helms, 459 U.S. 460, 468 (1983); Beverati v. Smith, 120 F.3d 500, 502 (4th Cir. 1997).

Here, Plaintiff has not stated a cognizable claim as he has failed to identify a liberty interest that is protected by the Due Process Clause. First, Plaintiff has not identified a state statute or regulation that has mandatory language creating an enforceable expectation of a liberty interest in remaining in a particular DOC facility. "[T]he ultimate determination of whether the conditions impose such an atypical and significant hardship that a liberty interest exists is a legal determination . . . ." Beverati, 120 F.3d at 503 (citing Sandin, 515 U.S. at 485-87). Here, where regulations concerning transfers among facilities are of general application and contemplate routine transfers, they do not impose "atypical and significant hardship on the inmate" as defined in Sandin. Because Plaintiff has not plead a legitimate liberty interest — a necessary element of

8

a procedural due process claim — Plaintiff has failed to state a claim concerning his transfers between DOC facilities.

Classification decisions do not implicate a liberty interest. As a prisoner, Plaintiff is not entitled to the process due to persons who remain at liberty. "Prisoners held in lawful confinement have their liberty curtailed by definition, so the procedural protections to which they are entitled are more limited than in cases where the right at stake is the right to be free from confinement at all." Wilkinson v. Austin, 545 U.S. 209, 225 (2005). Expertise of prison officials in matters of security must be given its due deference. See Sandin, 515 U.S. at 482.

**Disciplinary Proceedings**

Likewise, Plaintiff's claims regarding his assignment to disciplinary segregation are subject to dismissal. In prison disciplinary proceedings where a prisoner faces the possible loss of good conduct credits, he is entitled to certain due process protections. See Wolff, 418 U.S. at 564. These include advance written notice of the charges against him, a hearing, the right to call witnesses and present evidence when doing so is not inconsistent with institutional safety and correctional concerns, and a written decision. Id., 418 U. S. at 564-571. Substantive due process is satisfied if the disciplinary hearing decision was based upon "some evidence." Superintendent, Mass. Correctional Institute v. Hill, 472 U.S. 445, 455 (1985).

Plaintiff was charged with a rule violation for being out of bounds and threatening an officer on May 19, 2008. He received timely notice of the violation. ECF No. 21, Ex. 3, p. 3. A hearing on the violation was timely held. Plaintiff's requested witnesses were not available and the hearing was postponed. Id., p. 5-6. The hearing reconvened. The reporting officer and Plaintiff testified, and the officer's matter of record was taken as evidence. The Hearing Officer did not find Plaintiff's testimony credible and found, by a preponderance of the evidence, based on the matter of record and testimony of the officer, that Plaintiff left the assigned area without

permission and directed threatening language at the officer. Plaintiff was found guilty of the rule violations and sentenced to a loss of good conduct credits as well as loss of commissary privileges. Id., p. 9-10.

On September 22, 2008, D. Barnes investigated a request slip Plaintiff submitted to the mail room. The slip threatened staff stating that if he did not receive a letter his mother had written him with pictures in it he would, "start sending your staff to the hospital! I don't give a fuck about no mace! I don't give a fuck about more charges!" After interviewing Plaintiff, the threat was deemed legitimate and Barnes charged Plaintiff with an inmate rule infraction for use of threatening language. Plaintiff was also placed on Level One Staff Alert and moved to a Staff Alert Cell,[2] where he remained for five days. Plaintiff was timely served with notice of the inmate rule infraction and was given a timely hearing. Plaintiff waived inmate representation as well as witnesses. In reaching his decision the Hearing Officer considered the notice of violation, Barnes's testimony and the writing of the inmate. Plaintiff was found guilty and sentenced to 150 days disciplinary segregation. No good conduct credits were revoked. Id. Ex. 4, Affidavit of Barnes and pp.1-16.

Plaintiff received an additional infraction on January 23, 2009, when he failed to return his food tray to Deshields. Plaintiff received notice of the rule infraction and was provided a timely hearing. At the hearing Plaintiff waived representation and witnesses. Plaintiff testified at the hearing that he received the rule infraction because he spoke out on behalf of another inmate who the officer had failed to feed. Officer Culotta reviewed the videotape of the event and testified that when Deshields went to Plaintiff's cell the tray had been moved. The Hearing Officer also considered the notice of inmate rule violations submitted by Deshields in finding that Plaintiff took the tray away from the feed slot and refused to give it to the officer. The

---

[2] Staff Alert Level One, among other things, restricts the inmate to bag lunches and no writing materials. ECF No. 21, Ex. 4, pp. 4 and 6.

Hearing Officer found the report of Deshields and testimony of Officer Culotta credible and reliable. Plaintiff was sentenced to 150 days of segregation as a result of his conduct. No good conduct credits were revoked. Id. Ex. 5. Affidavit of Deshields and pp. 2-10.

Plaintiff received an additional infraction on March 12, 2009, when he refused to accept his food tray and then placed his hand in the feed slot, preventing the correctional officer from closing the slot. At this time Plaintiff was already serving a disciplinary segregation sentence and was advised by Officer Smith that his failure to follow orders to remove his hand from the slot would result in his receiving an infraction and being placed on food loaf. Id., Ex. 6. As a result of this infraction Plaintiff was timely served with notice of the rule infraction, received a hearing wherein he declined representation and witnesses, and ultimately pleaded guilty to the offense. He was sentenced to a total term of 150 days of segregation. No good conduct credits were revoked. Id.

There is no dispute that, as to each of the disciplinary proceedings, Plaintiff complains of, he received all the process that was due. Plaintiff's claims regarding denial of due process are, therefore, denied.

**Access to Courts**

Prisoners have a constitutionally protected right of access to the courts. See Bounds v. Smith, 430 U. S. 817, 821 (1977). However:

> Bounds does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

Lewis v. Casey, 518 U. S. 343, 355 (1996).

11

"Ultimately, a prisoner wishing to establish an unconstitutional burden on his right of access to the courts must show 'actual injury' to 'the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts.'" O'Dell v. Netherland, 112 F.3d 773, 776 (4th Cir. 1997), quoting Lewis, 518 U.S. at 355. "The requirement that an inmate alleging a violation of Bounds must show actual injury derives ultimately from the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches." Lewis, 518 U.S. at 349.

Correctional Officer Tyler avers that she has never tampered with Plaintiff's mail. She states that on December 4, 2009, she interviewed Plaintiff regarding his mail concerns. At that time Plaintiff advised that he sent stamps to a publisher as payment for a book order. Plaintiff further complained that he was denied stamps through the commissary and, therefore, was forced to send mail out certified. Tyler's investigation uncovered no evidence to verify Plaintiff's complaints. Tyler avers that outgoing mail is not opened and that all packages coming into to ECI go through the warehouse, not the mailroom. Id. Ex. 7. Affidavit of Tyler and Exs.

As to Plaintiff's specific complaint that mail intended to be filed with the Supreme Court was impermissibly delayed, the record demonstrates that on April 28, 2009, Plaintiff was advised that mail he attempted to send was returned to the institution from the post office with postage due. Plaintiff was advised how to pay the additional postage. Id. Ex. 12, p. 3.

On May 18, 2009, Plaintiff filed an administrative remedy request indicating that he learned that mail he had submitted two weeks prior had not been delivered. The Warden responded to the request indicating that the mail in question was received by the ECI mailroom but required additional postage. Plaintiff was advised of the need for additional postage and

12

filled out a voucher for same; however, the voucher was not received by the mailroom, but rather received by the inmate accounts department which resulted in a delay. Once the voucher was received by the mailroom it was forwarded to the post office for processing. Staff was advised that vouchers for additional postage were to be forwarded to the mailroom. Id. Ex. 13. There is no evidence that anyone intentionally interfered with Plaintiff's mail. Moreover, Plaintiff contributed to the delay in having this mail delivered by refusing to submit a second voucher for the postage due and seeking to straighten out the over payment at a later date. Instead, when Plaintiff's voucher was incorrectly delivered to the inmate accounts department rather than to the mailroom, Plaintiff insisted on filing ARPs complaining of the delay in posting his mail and refusing to be "double billed" for the postage. If this package contained documents that were time-sensitive, it would appear that the better path would have been for Plaintiff to pay the additional $3.69 and sort out the overpayment after his important papers had been processed. Rather, Plaintiff filed complaints alleging that the staff was extorting him. Id.

Additionally, Plaintiff complained, through numerous administrative remedies, that due to his segregation status he was denied physical access to the law library and, as he was acting as his own attorney in several cases, this amounted to a denial of access to the courts. Plaintiff's ARPs were dismissed. Plaintiff was advised that he was provided access to legal materials in compliance with ECI ID135-2-2, which provides that inmates on special housing are permitted the following services: "Library Assistance to State Institutions ("LASI") through institutional mail; answers to reference questions via institutional mail; and requests for specific titles or by subject area for print materials to be processed weekly by the librarian." Id. Ex. 9. Plaintiff was also advised that per institutional directives, books could only be ordered from pre-approved

13

vendors.

Plaintiff has failed to demonstrate a denial of access to the courts either in the temporary delay of his mail, his limited access to the law library due to his segregation status, or his inability to order whatever legal books he chooses. The only specific legal proceedings Plaintiff claims were affected was that his petition for writ of certiorari was not timely filed with the Supreme Court. As noted above, Plaintiff contributed to the delay in this filing; moreover, the prejudice caused by this delayed filing is speculative at best. To state a claim based on delay or non-delivery of legal mail, a prisoner must allege adverse consequence as basis for allegation that delay or non-delivery deprived him of meaningful access to the courts. See Lewis, 518 U.S. at 349; see also Morgan v. Montanye, 516 F.2d 1367 (2d Cir. 1975) (single interference did not violate Sixth Amendment). Plaintiff has failed to demonstrate actual injury as a result of any of the complained of conduct.

**Harassment**

Plaintiff's claim that Bozman laughed at him after he complained that he was falsely imprisoned fails to state a claim. Bozman denies that the interaction occurred as alleged. Rather, Bozman avers that his only recollection of a discussion with Plaintiff was that Plaintiff could not be transferred to another facility until his segregation time was completed. Id., Ex. 8. In any event, "not all undesirable behavior by state actors is unconstitutional." Pink v. Lester, 52 F.3d 73, 75 (4th Cir. 1995). Verbal abuse of inmates by guards, including aggravating language, without more, states no constitutional claim. See Collins v. Cundy, 603 F.2d 825, 827 (10th Cir. 1979) (sheriff laughed at inmate and threatened to hang him); Blades v. Schuetzle, 302 F.3d 801, 805 (8th Cir. 2002) (racial slurs); Cole v. Cole, 633 F.2d 1083, 1091 (4th Cir. 1980) (no harm alleged from claimed verbal harassment and abuse by police officer). Accordingly,

14

Plaintiff's allegations that Bozman mocked him fails to state a claim.

**Retaliation**

In order to prevail on a claim of retaliation, Plaintiff "must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994). "'A complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleading alone.'" Gill v. Mooney, 824 F.2d 192, 194 (2nd Cir. 1987) (quoting Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983)); Pierce v. King, 918 F. Supp. 932, 945 (E.D.N.C. 1996) (conclusory allegations of retaliation insufficient to state claim). Plaintiff offers nothing in support of his claim other than self-serving conclusory averments. There is nothing in the record to suggest that Defendants acted in the manner alleged.

Plaintiff lists several bald allegations of retaliation. He claims that Bozman retaliated against him by keeping him on "lock up," that Barnes placed him in a "strip cell" because he filed a request about his mail, that Deshields falsified an infraction because Plaintiff spoke out on behalf of another inmate, that he was placed on food-loaf, and that he was mistreated after refusing his food tray on March 12, 2009. ECF No. 1.

As noted above, Bozman avers that he did not keep Plaintiff on "lock up," but that headvised Plaintiff that he could not be transferred to another facility until his disciplinary segregation time had been served. Additionally, the evidence before the Court refutes Plaintiff's allegation that he was placed in a strip cell. Rather, Plaintiff was placed in a staff alert cell due to his written and verbal threats to harm staff based on his belief that photographs sent from his

15

mother were not delivered to him. Additionally, Deshields avers that he did not write a false infraction against Plaintiff, and, as noted above, Plaintiff received a full and fair hearing as to the disciplinary charge lodged by Deshields for failing to return the food tray. The record further shows that Plaintiff was placed on food loaf due his refusal to comply with orders to remove his arm from the feed slot while he was housed on disciplinary segregation. "In the prison context, we treat [claims of retaliation] with skepticism because 'every act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct.'" Cochran v. Morris, 73 F.3d 1310, 1317 (4th Cir. 1996). For these reasons, Plaintiff cannot prevail on his retaliation claim.

**Conclusion**

In light of the above analysis, Defendants' Motion to Dismiss or for Summary Judgment, construed as a Motion for Summary Judgment, shall be granted as to all claims. A separate Order follows.

August 3, 2011                                         /s/
                                        _____
                                        Benson Everett Legg
                                        United States District Judge